**NICHOLAS A. PILGRIM (Not admitted in EDNY)**
**J. LEE BUCK II (Not admitted in EDNY)**
**EDWARD B. GERARD (Not admitted in EDNY)**
**CHRISTOPHER R. MATHEWS (Not admitted in EDNY)**
**ALEXANDER M. VASILESCU (Admitted in EDNY)**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, NE**
**Washington, DC 20549**
**Telephone: (202) 551-8430 (Pilgrim)**
**Email: pilgrimn@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** : | |
| : | |
| **Plaintiff,** : | |
| **v.** : | |
| : | **ECF CASE** |
| **GIGA ENTERTAINMENT MEDIA, INC.,** : | |
| **GARY S. NERLINGER,** : | **COMPLAINT** |
| **LAWRENCE W. SILVER,** : | |
| **ALFRED R. COLUCCI,** : | |
| **CHARLES G. NOSKA, and** : | |
| **JARRET M. STREINER,** : | |
| : | |
| : | |
| **Defendants.** : | |
| : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants Giga Entertainment Media, Inc. ("Giga" or "the company"), Gary S. Nerlinger, Lawrence W. Silver, Alfred R. Colucci, Charles G. Noska, and Jarret M. Streiner (collectively, "Defendants"), alleges as follows:

## I.  SUMMARY OF ALLEGATIONS

1.  The Commission brings this action to enjoin Defendants from violating the antifraud and registration provisions of the federal securities laws.

2.     Between June 2012 and June 2017 (the "Relevant Period"), Giga, Nerlinger, Silver, Colucci, and Noska perpetrated a fraudulent scheme to conceal Nerlinger's role as a control person of Giga for the purpose of hiding Nerlinger's prior criminal fraud conviction from third parties, including Giga's auditor, underwriter, and existing and potential investors.

3.     For example, Giga, under the direction of Nerlinger, Silver, Colucci, and Noska (the "Control Group"), solicited and sold securities with materials and statements that described the management of the company without disclosing that Nerlinger was a *de facto* officer of and control person for Giga.   Furthermore, the Control Group took steps to falsify key corporate documents in order to conceal Nerlinger's role.   Additionally, Silver and Nerlinger lied when asked by the company's auditor and prospective underwriter, respectively, about Nerlinger's role with the company.

4.     Beyond the fraudulent scheme described above, Giga, Nerlinger, Colucci, and Streiner also made material misstatements to existing and potential investors regarding the marketing campaign for SELFEO, the company's mobile device application ("app").   From May 2016 until early 2017, the company touted in its communications to investors and potential investors the growth of downloads of SELFEO and the high ranking the app achieved in the Apple iOS App Store ("App Store").   However, the company's failure to disclose that the vast majority of these downloads were generated via paid third-party "user acquisition" campaigns misled investors and potential investors about the success of SELFEO.   Moreover, after Giga stopped running the user acquisition campaigns, the company and Streiner materially overstated the growth of SELFEO downloads and misled existing and potential investors about the app's growth trajectory throughout 2016.   Colucci, in a communication to an investor, also materially overstated the number of downloads SELFEO had experienced.

2

5.     Furthermore, in May 2016, the company and Nerlinger made material misstatements to investors concerning a putative valuation of $1 billion for the company, which had no basis in reality.

6.     Finally, in November 2016, the company made material misstatements about the projected timeline for the filing of a Regulation A+ securities offering.

7.     In addition to the fraudulent conduct described above, from at least July 2013 to the present, Giga has solicited investors and sold at least $12,212,776 worth of securities to at least 299 individuals without complying with the applicable registration provisions of the securities laws.

## II.     VIOLATIONS AND RELIEF SOUGHT

8.     By virtue of the conduct alleged in this Complaint, Giga, Nerlinger, Silver, and Colucci violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  Noska violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a) and (c).  Streiner violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2); Section 10(b) of the Exchange Act, and Rule 10b-5(b) thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b); and aided and abetted Giga's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2); Section 10(b) of the Exchange Act, and Rule 10b-5(b) thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).  Additionally, Giga violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

9.      Unless restrained and enjoined, Defendants will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint, and in acts, practices, transactions, and courses of business of a similar type and object.

10.     The Commission therefore respectfully requests that the Court enter: (i) a permanent injunction restraining and enjoining Defendants from violating the federal securities laws; (ii) an order directing Nerlinger to pay disgorgement with prejudgment interest; and (iii) an order directing Nerlinger, Silver, Colucci, Noska, and Streiner to pay civil monetary penalties.

## III.     JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

12.     The Court has personal jurisdiction over Defendants, and venue is proper in this District, because, among other things, throughout the Relevant Period, Giga's principal place of business was in Lake Success, New York, which is within this District; Nerlinger, who acted as the primary control person of Giga, resides in this District; the company offered and sold securities to investors in this District; and a substantial part of the acts or omissions giving rise to the Commission's claims occurred in this District.

13.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.    DEFENDANTS

14.    Giga Entertainment Media, Inc. is a Nevada corporation which was formed in or around May 24, 2012 as a successor entity to Digital Broadcast Corporation, Inc. ("DBC"). During the Relevant Period, its principal office was located in Lake Success, New York.  Giga is engaged in the development of software to be used for the creation, consumption, and networking of digital content online, and its core product is a social media service which is brand named SELFEO.

15.    Gary S. Nerlinger, age 60, resides in Nassau County, New York.  During the Relevant Period he was a control person of Giga.  In 1987, Nerlinger was found guilty of mail fraud and conspiracy to commit mail fraud for his role in a scheme involving the inappropriate allocation of profits from commodities trading.  He was sentenced to six months in prison and released on or about June 8, 1989.  Subsequently, he was part of a group that formed and managed DBC, a company which offered wireless cable services to customers.  After DBC failed, the former DBC control group (which eventually included defendants Silver, Colucci, and Noska) led by Nerlinger formed Giga in 2012.  Nerlinger was initially named Chief Executive Officer, President, and a director of Giga.  However, the company retroactively removed him from these positions in order to keep Nerlinger out of its corporate records.  Subsequently, during a brief period in 2015, Nerlinger served as the CEO of Giga, but he stepped down after an investor found out about Nerlinger's fraud conviction and withdrew his pledge to invest.  From July 2017 until around June 2018, Nerlinger served as President of Giga.  Notwithstanding the various changes in his title, throughout the Relevant Period, Nerlinger acted as the primary control person of Giga.

16.     Lawrence W. Silver, age 76, resides in Walnut Creek, California.  From the inception of Giga until around April 2018, Silver served as the Vice President of Administration, Secretary, and Treasurer of Giga.  Prior to the formation of Giga, Silver served as Vice President of Administration and Chief Financial Officer of DBC.

17.     Alfred R. Colucci, age 65, resides in Glenolden, Pennsylvania.   From the inception of Giga until around April 2018, Colucci acted as Vice President of Systems Administration and was a director of Giga.

18.     Charles G. Noska, age 75, resides in Red Hill, Pennsylvania.   From around August 2012 until around April 2018, Noska served as a director of Giga and, at various points, as Liaison to the Investment Relations Committee and as Vice President of Logistic Integration.

19.     Jarret M. Streiner, age 43, resides in Parkland, Florida.  From November 2015 until February 2017, Streiner served as the nominal Chief Executive Officer of Giga.  Despite his title, Streiner's responsibilities were limited to marketing.  He took an active role in managing Giga's user acquisition effort, which is described in greater detail below.

V.     **FACTUAL BACKGROUND**

     A.     <u>**Nerlinger's Criminal History**</u>

20.     From early 1982 until December 1983, a group of commodities brokers at First Commodity Corp. of Boston ("FCCB") used the firm's trade allocation process to disproportionally direct profitable trades to accounts owned or controlled by the scheme's participants.  As part of the fraud, the participants created accounts in the names of relatives to circumvent the firm's rule against traders owning accounts at the firm.  At some point, Nerlinger, who was working as a commodities salesman at FCCB, was informed of the scheme and invited to participate.  He did so and created an account in August 1982 in the name of his then-fiancée.

The account ultimately received approximately $62,000 in diverted profits, which Nerlinger split equally with the scheme participants.  Nerlinger left FCCB in March 1983, and the fraud was ultimately detected in December 1983.  On or about December 22, 1987, Nerlinger was convicted by a jury of mail fraud and conspiracy to commit mail fraud and sentenced to six months in prison.  He was released on or about June 8, 1989.

### B.  Formation of Giga

21.     As noted above, Nerlinger, Silver, Colucci, and Noska served as control persons at DBC, a company which provided cable television to customers in and around Roanoke, Virginia.  After DBC closed in or about 2009, the Control Group formed Giga to shift DBC's business to a different model—specifically to broadcast television cable programming over the internet.  On or about May 24, 2012, Silver incorporated Giga in Nevada.  As reflected by the first version of the meeting minutes, on June 1, 2012, Giga held its initial Board meeting at which Silver, Nerlinger, and Colucci were appointed as directors, Nerlinger as president and CEO, Colucci as vice president, and Silver as secretary/treasurer.  As discussed below, these minutes were subsequently doctored as part of the company's fraudulent scheme to hide Nerlinger's role as a control person at Giga.

### C.  Nerlinger Ran and Managed Giga as an Undisclosed Control Person

22.     From 2012 to 2018, Nerlinger was the dominant figure at Giga.  He acted as the *de facto* CEO running the day-to-day operations of the company.  He was involved in managing every aspect of the company, including in the areas of strategy, product development, marketing, financing, personnel, and investor communications.

23.     After formation, out of convenience to Nerlinger, Giga leased office space at a location (in Lake Success, New York) close to his home in the Long Island area.  He was the

only member of the Control Group who resided near and regularly worked out of the Lake

Success office, and he alone managed operations and oversaw the employees there.

24.     From 2012 to 2018, Nerlinger was by far the highest paid person at Giga.  In 2015

alone, he received compensation of approximately $325,000, which was several multiples higher

than the next highest paid person at Giga.  At the end of 2015, Nerlinger entered into a

"consulting" agreement with the company, which entitled him to receive annual compensation of

$120,000 (at least $239,807.16 less than he was actually paid).  Even while serving as a

"consultant," Nerlinger alone enjoyed unique corporate perks at Giga, which included using a

corporate debit card, without any apparent restriction, to pay for personal expenses.

25.     Except for limited periods of time (which are alleged herein), Nerlinger did not

serve in a formal capacity at Giga during the Relevant Period.  For the bulk of this period, the

Control Group agreed to keep Nerlinger from having a formal titled position at the company out

of concern that if Nerlinger were a named officer or director of Giga, potential investors would

learn about his past criminal history and decline to invest.

26.     As alluded to previously, Giga held its initial Board meeting on June 1, 2012, in

which Silver, Nerlinger, and Colucci were appointed as directors, Nerlinger as president and

CEO, Colucci as vice president, and Silver as secretary/treasurer.  Nerlinger accepted his initial

appointment, and a copy of the minutes was signed by all three individuals and faxed to the

company's counsel on June 11, 2012.

27.     At some point following the initial Board meeting, between June and August

2012, Giga hired an individual to serve as the CEO ("Nominal CEO #1).  Rather than hold

another Board meeting to remove Nerlinger as CEO and appoint Nominal CEO #1, the company

fraudulently drafted a second version of the minutes for the initial June 1, 2012 meeting.  This

second version of the minutes, which scrubbed any reference to Nerlinger as President or CEO, stated that Nominal CEO #1 was appointed to be President and CEO at the June 1, 2012 Board meeting.  In this fraudulent second version of the Board minutes, Silver, Nerlinger, and Colucci remained as named directors and each likewise signed their approval thereof despite knowing that the second version was materially misleading since Nerlinger, not Nominal CEO #1, had been appointed President and CEO at the initial June 1, 2012 meeting.

28.     At no later than June 6, 2014, a third version of the minutes of the initial June 1, 2012 meeting was drafted.  This third version named Nominal CEO #1 as President and CEO, but Silver and Colucci were named as the only Board members, and they alone signed it. Nerlinger was neither referenced at all in this third version of the minutes nor did he sign them.

29.     Between 2012 and 2017, Nerlinger and Giga brought in a slate of largely figurehead CEOs to be the public face of the company without substantive management responsibilities.  Each of these nominal CEOs worked remotely and either received no salary or were paid less than the agreed to amounts.  Additionally, each seemed to serve at the whim of Nerlinger.  Thus, when Nerlinger became displeased with Nominal CEO #1 and two subsequent nominal CEOs, all three were fired.  As for Streiner, who became Giga's CEO in or about November 2015, Giga stopped paying him, which forced him to wind down his role and ultimately depart from the company in February 2017.

30.     After Giga's second nominal CEO was fired in or about July 2015, Nerlinger, tired of hiding his role from the company, decided he would formally assume the position.  On July 26, 2015, he declared to Colucci in an email "I AM THE NEW CEO. . . THAT's IT." Nerlinger subsequently informed the other members of the Board of his decision to become the

CEO.  In response, at least two of the outside directors of Giga responded that they had believed he already held that title.

31.     Between July and October 2015, Nerlinger served as the CEO of Giga.  In or about October 2015, Nerlinger suddenly changed his mind about holding the formal title of CEO at the company.  As he explained in a November 1, 2015 email that he sent to a close friend and adviser, Nerlinger had learned in mid-October that a new investor, who had apparently committed to investing $500,000 in Giga, had discovered Nerlinger's criminal history in an online search and had subsequently withdrawn his commitment.

32.     In his November 1, 2015 email, Nerlinger confided to his friend that his distress over this development and his concern that other potential investors would similarly find out about his criminal past had prompted him to change his mind about publicly serving as Giga's CEO.  Nerlinger lamented to another adviser that it "isn't 1995 anymore" referring to the fact that, because of advances in technology and information made available through internet web searches, his criminal past would continue to haunt the company as long as he was disclosed as Giga's CEO.  After this experience, Nerlinger decided once again to avoid having any formal role as an officer or director of Giga to minimize the risk of the company losing more investors if his criminal conviction was discovered.

33.     Thereafter, Giga hired Streiner as a nominal CEO in or about November 2015, and Nerlinger assumed the role of an "independent consultant" on paper.  However, he continued to serve as the *de facto* CEO and control person at Giga, notwithstanding the terms of his consultant agreement.

34.     Between 2012 and July 2017, Giga disseminated to its investors numerous iterations of private placement memoranda, business plans, email updates, and press releases

which failed to disclose that Nerlinger was part of Giga management.  In this same time period,

Giga held a number of conference calls in which Nerlinger regularly spoke to investors.

However, on information and belief, Nerlinger only disclosed his first name on a few of the

conference calls and failed to disclose at any time his actual role or responsibilities within Giga.

35.     On information and belief, until July 31, 2017 Giga never disclosed to investors or

potential investors that Nerlinger had a prior criminal history.  In fact, a number of Giga investors

have reported that they were not previously aware of Nerlinger's criminal fraud conviction.

36.     Instead of disclosing Nerlinger's true role at the company and his criminal

background, between 2012 and 2017, Giga, with the knowledge and approval of the Control

Group, took a number of steps to conceal Nerlinger's role and criminal history from investors

and third parties.  For example, as alleged in paragraphs 26-28, Giga revised the minutes of the

initial Board meeting to remove all references to Nerlinger, including his initial appointments as

CEO, President, and director, and backdated the appointment of Nominal CEO #1 to the

formation of the company.

37.     Also, in or about November 2015, Nerlinger entered into a consulting agreement

with Giga.  In that time period, Nerlinger directed Noska to backdate his newly-inked consulting

agreement to 2012 to make it appear as though Nerlinger had served as a consultant (and not as

an officer and director) since August 2012.  Noska subsequently backdated the agreement as

requested.  This fraudulent conduct was carried out by Nerlinger and Noska, at least in part, to

appease the company's then-corporate attorney who was expressing concerns about whether

Nerlinger's undisclosed relationship with Giga was lawful in light of his responsibilities within

the company during the period from 2012 to 2015.

38.     In early 2016, Nerlinger falsely represented to investment bankers at a firm ("Investment Bank #1") that he did not have a day-to-day or managing role with Giga in order to assuage Investment Bank #1's concerns about representing the company in an initial public offering ("IPO").  At that time, Giga was seeking to hire Investment Bank #1 to be the underwriter for the company's Regulation A+ offering.  At their introductory meeting, investment bankers at Investment Bank #1 inquired whether any one at Giga had a criminal history.  They explained that Investment Bank #1's practice was to run a background check on the management of its clients, as part of its due diligence, and that if anyone at Giga had a prior criminal history, it should be disclosed immediately.  Nerlinger responded that he had a prior criminal conviction, but assuaged Investment Bank #1's unease about working with Giga by claiming that he was just a shareholder and consultant and would not have a managing or day-to-day role in the company.  This misrepresentation was significant to Investment Bank #1, which would not have entered into a relationship with Giga had it learned Nerlinger did have a managing role in the company despite his claim to the contrary.

39.     Subsequently, Nerlinger presented Streiner to Investment Bank #1 as the point of contact at Giga for the relationship.  Nerlinger did so to conceal his active continuing managing role at the company from Investment Bank #1.  After Nerlinger successfully misled Investment Bank #1, Giga touted its relationship with the investment bank to its investors as evidence that an IPO was imminent without disclosing that its relationship with Investment Bank #1 was based on a lie concerning Nerlinger's role in the company.

40.     Between June and August 2016, Giga also misled an auditing firm about Nerlinger's role within Giga.  In or about June 2016, Giga retained the auditing firm to audit its financial statements for the years 2014 and 2015.  As part of its typical due diligence, the

auditing firm asked Giga, via its outside accountant, to produce information about its

management.  In response, Noska created an organizational chart for the auditing firm to review

which purported to identify all significant persons affiliated with Giga, including members of

management, significant employees, and outside service providers such as legal advisors,

accountants, and auditors.  Notably missing from the otherwise comprehensive chart given to the

auditing firm, however, was Nerlinger, who Noska failed to identify as a member of Giga's

management team in a deliberate effort to mislead the auditing firm.

41.     Based on this fraudulent organizational chart and his lack of interaction with

Nerlinger, the auditing firm's lead audit partner was initially misled into believing that Nerlinger

did not have a management or decisive role at Giga.  That changed when the lead audit person

met with Nerlinger while the auditing firm was preparing to finalize its audit in September 2016.

The lead audit partner observed that Nerlinger was behaving at Giga as though he was the CEO

of the company, which led him to suspect that Nerlinger might be a member of Giga

management.  He subsequently ran a background check on Nerlinger and learned that he

(Nerlinger) had a prior criminal fraud conviction.  Reluctant to proceed with the audit, the lead

audit person subsequently sought to clarify Nerlinger's role in the company.  When he first

inquired, Giga told the lead audit partner that Nerlinger was "just a shareholder."  Not satisfied

with this response, the lead audit partner arranged for a telephone conference call with Silver and

one of the auditing firm's in-house attorneys on or about September 21, 2016.  Silver assured

them during the call that Nerlinger did not have a managing, or even a day-to-day, role in Giga

and that the company was managed by others.  The auditing firm relied on Silver's false

assurances in going forward with and finalizing the audit, and Giga subsequently touted the

completion of the audit to its investors as further evidence that an IPO was imminent without disclosing the lies that had induced the auditing firm to finalize the audit.

42.     In or about April 2017, Giga, with the approval of the Control Group, commenced a coordinated misinformation campaign to hide Nerlinger's conviction from potential investors. As noted previously herein, Nerlinger had long harbored concerns about potential investors discovering his criminal conviction online, which he and other members of the Control Group feared would deter these individuals from investing in Giga.  In fact, Nerlinger, Silver, Colucci, and Noska were well aware that the top result from a Google search of the name "Gary Nerlinger" was a court decision affirming his criminal fraud conviction.  To lessen the risk of potential investors learning about the criminal conviction, Giga hired a company to suppress the online availability of information about Nerlinger's criminal conviction.  Under this "reputation management" campaign, the hired company created new websites in which it posted articles and blog posts containing favorable coverage of Nerlinger in order to manipulate the Google search results.  The idea behind this campaign was that, as users clicked on the articles and posts, these sites would move higher in the Google search results while the sites containing information about Nerlinger's criminal history would move down and be less likely to be seen in a search.  To conceal any link between Giga and Nerlinger from potential investors and other third-parties, the Control Group arranged the campaign so that the articles and posts included quotes and information about Nerlinger without any reference to Giga.

**D.     Defendants Also Defrauded the Public By Failing to Disclose Giga's Paid User Acquisition Campaigns and Providing Misleading Download Numbers**

43.     Giga released its app, SELFEO, in the Apple App Store in December 2015. According to Giga's promotional materials, SELFEO enables users to combine video recordings

of themselves with other videos, such as those found on YouTube or other video streaming services.

44.     Following the release of SELFEO into the App Store, Giga engaged in a traditional marketing campaign to increase the number of users downloading the app.  This marketing campaign involved renting billboards in New York City and in several major sporting stadiums, as well as paying for advertisements on a national network of radio stations.

45.     Despite these costly efforts, very few users downloaded SELFEO in the months following its release on the App Store.  By the end of January 2016, SELFEO had been downloaded only 879 times, well below what Giga had been hoping for.  By the end of February 2016, the total had reached only approximately 1,600.

46.     Starting in February 2016, Giga began hiring user acquisition ("UA") firms to boost the number of app downloads and achieve top rankings in App Store categories.  Some app developers engage UA firms to generate a specific number of downloads for a certain period of time and pay them on a per-download basis.  These are referred to as "paid downloads" because the client is directly paying the UA firm for them.  The methods of delivering paid downloads vary by UA provider.  But regardless of the means used by different UA firms to deliver downloads for their customers, the transaction is substantively the same for the client: money is exchanged for a specific number of downloads.

47.     In February 2016, Streiner arranged for Giga to hire a particular UA firm ("UA Firm #1").  As a test run of sorts, Giga paid UA Firm #1 $3.00 per download for a total of 100 downloads and for positive user reviews.

48.     Later in February 2016, Streiner arranged for Giga to hire another UA firm ("UA Firm #2").  According to UA Firm #2's promotional materials, the firm pays users between $0.02

and $0.05 for each download it delivers to a client.  Giga paid UA Firm #2 $500 for a total of

1,000 downloads, and UA Firm #2 delivered this number of downloads for Giga's SELFEO App.

UA Firm #2 also agreed to drive SELFEO's App Store rankings in the "multitasking" category.

Due to the UA firm's efforts, SELFEO rose to the top of the "multitasking" category in the App

Store in or about February 2016.

49.     In May 2016, Giga hired a third UA Firm ("UA Firm #3").  Giga agreed to pay

UA Firm #3 $1.00 for every download the UA firm delivered, up to a total of 125,000

downloads.  UA Firm #3's campaign was immediately successful in driving significant numbers

of downloads of the SELFEO app.  Within three days of the start of the campaign, SELFEO

reached the top ten of the App Store rankings in the Social Media category and seventy-ninth in

the rankings for all apps in the App Store.

50.     UA Firm #3 started its campaign on or about May 6, 2016.  Within days of

starting the campaign, employees at UA Firm #3 communicated to Streiner that unless Giga

agreed to raise the cap on the number of paid downloads, the download numbers and rankings for

SELFEO would plummet.  At Nerlinger's direction, Streiner agreed to raise the cap.

51.     Between on or about May 6, 2016 and on or about May 29, 2016, UA Firm #3

delivered 338,562 paid downloads of the SELFEO app.

52.     In or about May 2016, Nerlinger, Streiner, and other Giga employees were

informed that UA Firm #3's campaign involved, at least in part, individuals being offered and

paid gift cards in exchange for downloading the SELFEO app.

53.     Although the paid campaign by UA Firm #3 led to a surge in downloads for the

SELFEO app, as soon as this campaign ended the SELFEO downloads and rankings plummeted.

16

54.     On June 9, 2016, Giga hired yet another UA Firm ("UA Firm #4") to provide UA services from June 2016 to August 2016.  Over this period of time, Giga received approximately 220,000 paid downloads as a result of UA Firm #4's efforts.

55.     UA Firm #4's paid campaigns on behalf of Giga temporarily lifted SELFEO back into the top rankings of various App Store charts.  But, as soon as these campaigns ceased, the downloads and rankings for the SELFEO app fell dramatically once again.

56.     Giga's initial strategy in hiring UA firms to deliver downloads was to artificially boost SELFEO's App Store rankings in order to attract enough attention and non-paid downloads (referred to as "organic downloads") that SELFEO's downloads would remain high even after the paid download campaigns ended.  None of the UA campaigns, however, produced organic downloads in significant numbers, and both Nerlinger and Streiner were aware of this significant fact.

57.     In particular, from February 2016 through August 2016, Giga ordered a total of at least 559,662 paid downloads in the various UA campaigns.  Over this same period, SELFEO was downloaded approximately 570,000 times in total.  Thus, the vast majority of SELFEO app downloads were paid downloads during this period.

58.     Throughout the time period of the UA campaigns, Giga, Nerlinger, and Streiner repeatedly touted the download numbers and the artificially elevated rankings of the SELFEO app in the App Store's various categories.  For instance, in a March 9, 2016 press release, the company bragged that it was then the "#1 Multitasking App".  The press release also stated that:

    "A recent intensive marketing campaign with iHeartRadio to reach its 250 million

    monthly devoted listeners, as well as other high profile promotions, has been a factor in

    SELFEO's global awareness, especially among Millennials."

59.     Notably, however, this March 9, 2016 press release, which was approved by Nerlinger, failed to disclose that the SELFEO app had achieved this high ranking as a result of its paid user acquisition campaign with UA Firm # 2.  Instead, Giga materially misled the public by withholding this information and falsely associating the boost in SELFEO downloads with a radio advertisement campaign the company had launched.

60.     On May 31, 2016, Giga sent a letter, which was approved by Nerlinger, to its shareholders continuing to tout the growth of download numbers and its App Store rankings without disclosing that these downloads were the result of paid UA campaigns.  The letter instead explicitly attributed the download growth to the company's traditional billboard and radio advertisement campaign.  It also emphasized the importance of these download numbers to shareholders by explaining: "[r]emember, we now live in the world of social media networking. The valuation is based solely upon eyeballs and the rate of growth and the rate of growth [sic] of downloads."  Due to an apparent clerical error by Streiner, the letter also tabulated the number of downloads incorrectly, claiming that SELFEO had been downloaded 488,000 times, when, in fact, the actual number was only about 300,000.

61.     On June 27, 2016, the company sent an email to shareholders claiming "SELFEO DOWNLOADS SURGE CLOSING IN ON 700,000".  Like the previous communications, the June 27, 2016 email described the traditional marketing campaign in detail, but again failed to disclose even that Giga had run UA campaigns, much less that the vast majority of the downloads being touted were paid downloads.  As Nerlinger and Streiner knew, throughout the period of these statements, the traditional marketing campaign contributed very little to the download numbers for SELFEO.  However, these material facts were consistently concealed from existing and potential investors by Giga, Nerlinger, and Streiner.

62.     In particular, when touting the download growth of SELFEO and its App Store rankings to investors, the company never disclosed that the cause of the growth and rankings was Giga's UA campaigns or that SELFEO's download growth and rankings had promptly plummeted following the end of each UA campaign.  The company also never disclosed its strategy of using UA campaigns to produce "organic" growth, much less that this key strategy for establishing long-term viability for SELFEO had failed completely.

63.     Significantly, several of the UA campaigns were specifically timed to coincide with important meetings between Giga and existing or potential investors, demonstrating that Giga sought to woo investors using the artificially inflated download numbers.  For example, on or about June 12, 2016, at Nerlinger's direction, Giga ran a user acquisition campaign with the assistance of UA Firm #4 in order to boost the SELFEO app's rankings prior to a scheduled call with a potential major investor.

64.     In a June 29, 2016 email sent to Streiner, a Giga employee made a reference comparing Giga's UA campaigns to the plot of a HBO television show involving a fraudulent UA campaign.  The email read: "Not to mention this past weekend's episode of Silicon Valley covering the topic of paid downloads as fraud to investors."

65.     Notably, by as early as July 2016, the company discovered that it had greatly overstated the number of downloads in its May 31, 2016 communication to shareholders.  Nevertheless, Giga continued to mislead investors about its download numbers and did not issue a correction to investors until over a year later, in a July 31, 2017 letter.

66.     On August 15, 2016, Colucci wrote in an email to an investor that "[w]e are at 800,000 or so [downloads]."  On November 11, 2016, Colucci was informed by a co-worker that as of that date, SELFEO had been downloaded only 570,000 times.  Notwithstanding being

corrected, Colucci wrote in another email to an investor on January 23, 2017 that SELFEO had been downloaded 1.2 million times. This investor subsequently made an additional investment based on Colucci's fraudulent misrepresentation.

67.     Additionally, on September 14, 2016, during a conference call with investors, Nerlinger made several false and misleading statements regarding the growth of SELFEO downloads. These included that "SELFEO was closing in on 1 million downloads in its first year" and "Think of a Twitter with visual audio on steroids and that's SELFEO, zero to 800,000 downloads, faster than any other social media icon in history and now on our path to millions, two, three, five, ten, and beyond."

68.     In fact, by September 14, 2016, the UA campaigns had ceased and the download numbers for the SELFEO app had stopped growing as a result. Indeed, as Nerlinger knew or should have known, the rate of growth of downloads, rankings, and number of active users of SELFEO at that time paled in comparison with the numbers achieved during the UA campaigns such that SELFEO was not on a "path to millions [of downloads], two, three, five, ten, and beyond," as Nerlinger falsely claimed.

69.     In October 2016, Nerlinger ordered Streiner to produce a chart showing SELFEO's downloads with a positive straight-line growth right up to the present. Streiner produced such a chart as directed, and the chart was included in a business plan given to potential investors. However, this chart was misleading, as both Nerlinger and Streiner knew or should have known, because it failed to reflect that the growth of SELFEO downloads spiked during the UA campaigns and plateaued once the campaigns ended in August 2016. In fact, Streiner acknowledged to a co-worker that the chart was misleading and that it had been Nerlinger's idea.

### E.      Billion-Dollar Valuation

70.      On two Giga shareholder conference calls in the spring of 2017, Nerlinger falsely claimed that the company's technology had received a valuation of $1 billion from an independent industry expert.

71.      For example, on May 10, 2017, Nerlinger stated on an investor call that: "In fact, last week in a meeting with our CTO [chief technology officer], several independent parties, and a major investor, a long time hard media executive who held executive positions at CBS, Viacom, Paramount, and the Sumner Redstone [sic] valued GEM's technologies at $1 billion." Nerlinger repeated this false claim in an investor call on May 31, 2017.

72.      In reality, the purported billion-dollar valuation Nerlinger touted was based on a non-committal statement made by an individual at an introductory meeting with Nerlinger in late April 2017.  The individual knew very little about the company prior to this meeting and was meeting with Giga to explore potential business opportunities.  During the meeting, Nerlinger, who was considering hiring the individual for Giga's open CEO position, suggested the company could have a billion-dollar value and, out of politeness, the individual responded that it was possible.  But as Nerlinger knew or should have known, the individual at issue had not performed (and could not have performed) a genuine valuation of Giga or its technology at this or any time because of his lack of expertise and familiarity with the company.  In addition, other participants at this meeting confirmed that this individual had not made any statements valuing the company, much less provided the "billion-dollar" valuation falsely touted by Nerlinger during shareholder conference calls.

### F.      Giga Misled Investors Regarding the Projected Timeline for an IPO

73.      Almost since the inception of Giga, its management has promised its investors that the company would go public.

74.      Throughout 2015 and 2016, the company communicated to its investors that an IPO was imminent.  It did so by publicly touting all the actions it was taking in preparation, such as hiring an underwriter and SEC counsel, and undertaking an audit of its financial statements.

75.      This series of statements culminated in a November 13, 2016 email to shareholders, which was approved by Nerlinger, stating, among other things, that the "IPO is expected to be filed by [its] SEC counsel. . . within the next 10 days."

76.      In fact, as Giga and Nerlinger knew or should have known, at this time, the company was not even close to being ready to file for an IPO.  Among other reasons, the company still required an accounting review of its financial records covering January 1, 2016 through September 30, 2016.  This step alone was expected to take a minimum of two months and little to none of the necessary work had been completed by the date of the November 13, 2016 email to shareholders.

### G.      Giga Unlawfully Solicited Investments and Sold Securities

77.      From at least July 2013 to the present, Giga has sold at least $12,212,776 worth of securities to at least 299 individuals.

78.      After the formation of Giga, the shareholders of DBC were offered a one-for-one share exchange for Giga stock.  Additionally, the existing shareholders were offered via email and telephone the opportunity to invest money for additional Giga equity shares.

79.      The company also solicited equity investments from new investors via referrals from existing shareholders and an investment bank engaged by Giga.

80.     Ultimately, Giga sold at least $4,246,083 worth of shares of common stock to at least 177 individuals during the Relevant Period.

81.     Additionally, starting in 2014, Giga began offering convertible debentures to existing and potential investors.  The debt instruments converted to equity shares after one year.

82.     Ultimately, Giga sold at least $5,270,266 worth of convertible debentures to at least 177 investors.

83.     Throughout the Relevant Period there was never a break in the securities offering, with investments being sold by or on behalf of Giga each and every calendar month.

84.     The company's security offering was not registered under the Securities Act.

85.     At least three individuals who purchased Giga equity or convertible debt securities were not accredited investors pursuant to Securities Act Rule 501, 17 C.F.R. § 230.501. Additionally, by offering the securities widely to friends and family of existing investors with no limitation placed on the financial experience or sophistication needed to invest, Giga solicited investments via general solicitation.  As a result, Giga was required to take reasonable steps to verify that its investors were accredited, which it did not do.  Giga also did not provide the unaccredited investors with the requisite non-financial and financial information described under Securities Act Rule 502(b), 17 C.F.R. § 230.502(b).

86.     Accordingly, Giga's securities offering does not qualify for registration exemptions under Securities Act Rules 504, 505 (which was revoked during the Relevant Period), and 506(b), 17 C.F.R. §§ 230.504, 505, and 506(b).

87.     No other registration exemption is available for Giga's offering.

## FIRST CLAIM FOR RELIEF

**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a) of the Securities Act**
**(Against Giga, Nerlinger, Silver, Colucci, and Noska)**

88.     The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

89.     Giga, Nerlinger, Silver, Colucci, and Noska, directly or indirectly, singly on in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, with scienter:

        (a)     employed devices, schemes, or artifices to defraud;

        (b)     obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

        (c)     engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

90.     By reason of the foregoing, Giga, Nerlinger, Silver, Colucci, and Noska violated and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**
**(Against Giga, Nerlinger, Silver, Colucci)**

91.     The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

92.     Giga, Nerlinger, Silver, and Colucci, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others.

93.     By reason of the foregoing, Giga, Nerlinger, Silver, and Colucci, violated and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder)**
**(Against Noska)**

94.     The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

95.     Noska, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange: (1) employed devices, schemes, or artifices to defraud; and (2) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others.

96.     By reason of the foregoing, Noska violated and, unless restrained and enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c).

## FOURTH CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Section 17(a)(2) of the Securities Act**
**(Against Streiner)**

97.     The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

98.     Streiner, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99.     By reason of the foregoing, Streiner violated and, unless restrained and enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## FIFTH CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder)**
**(Against Streiner)**

100.     The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

101.     Streiner, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of

interstate commerce, or of the mails, or of the facilities of a national securities exchange, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

102.    By reason of the foregoing, Streiner violated and, unless restrained and enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SIXTH CLAIM FOR RELIEF

### AIDING AND ABETTING VIOLATIONS BY GIGA
### (Violations of Section 17(a)(2) of the Securities Act)
### (Against Streiner)

103.    The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

104.    Through conduct described above, Giga violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

105.    Through the conduct described above, Streiner knowingly or recklessly provided substantial assistance to Giga's violation of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

106.    By reason of the foregoing, Streiner aided and abetted and, unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## SEVENTH CLAIM FOR RELIEF

### AIDING AND ABETTING VIOLATIONS BY GIGA
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder)
### (Against Streiner)

107.    The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

108.    Through conduct described above, Giga violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

109.    Through conduct described above, Streiner knowingly or recklessly provided substantial assistance to Giga's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

110.    By reason of the foregoing, Streiner aided and abetted and, unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## EIGHTH CLAIM FOR RELIEF

### SALE OF UNREGISTERED SECURITIES
### (Violation of Section 5(a) and 5(c) of the Securities Act)
### (Against Giga)

111.    The Commission repeats and realleges Paragraphs 1 through 87 of its Complaint as if fully set forth herein.

112.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint and no exemption from registration exists with respect to these securities and transactions.

113.    From no later than July 2013 until at least October 2017, Giga directly and indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, through the use or medium of a prospectus or otherwise; (b) carried securities or caused such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale; and (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities through the use or medium of any prospectus or otherwise, without a registration statement having been filed or being in effect with the Commission as to such securities.

114.    By reason of the foregoing, Giga violated and, unless restrained and enjoined, is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests the Court enter a Judgment:

### I.

Finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein.

### II.

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating:

- Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5, as to Giga, Nerlinger, Silver, and Colucci;

- Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c), as to Noska;

- Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. 240.10b-5(b), as to Streiner (both directly and as an aider-and-abettor); and

- Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), as to Giga.

### III.

Ordering Nerlinger, Silver, Colucci, Noska, and Streiner to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

### IV.

Ordering Nerlinger to disgorge any ill-gotten gains obtained as a result of the acts or courses of conduct alleged in this Complaint, plus prejudgment interest thereon.

### V.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Granting such other and further relief as this Court may determine to be just and necessary.

Dated: Washington, DC                    Respectfully submitted,

November 15, 2018

_____
Alexander M. Vasilescu
(New York Office admitted EDNY)
Nicholas A. Pilgrim (Not admitted in EDNY but admitted in New York)
J. Lee Buck II (Not admitted in EDNY but admitted in District of Columbia)
Christopher R. Mathews (Not admitted in EDNY but admitted in District of Columbia)
Edward B. Gerard (Not admitted in  EDNY but admitted in California)

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
100 F. Street, N.E
Washington, D.C. 20549
Telephone:  (202) 551-8430 (Pilgrim)
Email:  pilgrimn@sec.gov